# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ANNA R. NORRIS,              )
                                   )
            **Plaintiff,**       )
                                   )      **Civil Action No. 2:04-0016**
            **v.**                     )      **Judge Nixon / Knowles**
                                   )
**JO ANNE BARNHART,**        )
**Commissioner of Social Security**   )
                                   )
           **Defendant.**     )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff was not disabled and which denied Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 13. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 16.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

1

# I.  INTRODUCTION

Plaintiff filed her application for Disability Insurance Benefits on January 17, 2001,[1] alleging that she has been disabled since February 14, 1998, because of back and leg pain.[2] *See, e.g.,* Docket Entry No. 9, Attachment ("TR"), TR 57-59; 73.  Plaintiff's application was denied both initially (TR 38-41) and upon reconsideration (TR 43-44).  Plaintiff subsequently requested (TR 45) and received (TR 28-31) a hearing.  Plaintiff's hearing was conducted on May 21, 2003, by Administrative Law Judge ("ALJ") Mack Cherry.  TR 252-280.  Plaintiff and Vocational Expert, Rebecca Williams, appeared and testified.  TR 253-280.

On August 14, 2003, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 8-20.  Specifically, the ALJ made the following findings of fact:

> 1. The claimant meets the insured status requirements of the Act for title II purposes through at least the date of this decision.
>
> 2. The claimant has not engaged in substantial gainful activity since the alleged onset date of disability, February 14, 1998.
>
> 3. The claimant has a history of two successful back surgeries in April 1998, and has the "severe" impairments of degenerative disc disease, obesity, allergies and osteoarthritis of the left hip.
>
> 4. These medically determinable impairments do not meet or

---

[1] The date of filing of Plaintiff's Application For Disability Insurance Benefits is illegible.  The ALJ notes Plaintiff's protective filing date as January 17, 2001.  TR 11; 57.

[2] Although Plaintiff alleges only lower back and leg pain in her Disability Report (TR 76), Plaintiff alleges lower back and leg pain, degenerative disc disease, lower extremity edema, upper and lower thoracic osteophytes, obesity, hypertension, type II diabetes, and iron deficiency anemia in her Motion for Judgment on the Administrative Record (Docket Entry No. 13).

2

medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the residual functional capacity to perform light work activity (walk and/or stand for six out of eight hours and sit for six out of eight hours) which accommodates a sit/stand option requirement; no climbing of ladders, ropes or scaffolds; occasional climbing of stairs and ramps; occasional balancing, stooping, bending, kneeling, crouching and crawling; the avoidance of temperature extremes, dampness, wetness, humidity, vibration, fumes, odors, dust, gases, etc.; the avoidance of hazardous machinery and unprotected heights; and a moderate limitation in concentration, persistence and pace due to pain.

7.      The claimant is unable to perform any of her past relevant work.

8.      The claimant is 48 years old.

9.      The claimant has a high school equivalence education.

10.     The claimant has no transferable skills.

11.     Based on VE testimony and the claimant's age, education and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 202.21.

12.     The claimant has been "not disabled," as defined in the Act, since February 14, 1998.

TR 19-20.

On September 29, 2003, Plaintiff filed a request for review of the hearing decision. TR 7. On December 24, 2003, the Appeals Council issued a letter declining to review the case (TR 4-6), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the

3

Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to back and leg pain.[3] TR 73.

Dr. Robert Davis examined Plaintiff on October 23, 1995, for complaints of lower back pain and left leg pain that resulted from an on-the-job injury. TR 138-139. Dr. Davis reviewed lumbar spine x-rays and a lumbar MRI that had been performed at Cumberland Medical Center 10 days earlier. *Id.* Dr. Davis found "a large extruding left L5 HNP involving both the left L5 and left S1 nerve roots..." *Id.* Dr. Davis ordered Plaintiff not to return to work and discussed using Tylenol and Aleve. TR 138. Dr. Davis noted that if Plaintiff's condition did not improve in 2 weeks, he would discuss a lumbar epidural steriod injection, then surgical treatment. *Id.*

On November 1, 1995, Dr. Davis examined Plaintiff and determined that "her pain [had] improved," and that she should return to work. TR 137. One week later, on November 8, Plaintiff visited Dr. Davis' office to request a "release to full duty," and stated that she was "doing better." *Id.* On November 15, 1995, Plaintiff again visited Dr. Davis, who determined that "[s]he [had] no significant leg pain...[and] is to return to work with no restrictions." *Id.*

Plaintiff visited Fentress County Medical Center on October 20, 1996, complaining of headache, nausea, vomiting, and vertigo. TR 180. Dr. Richard Smith examined Plaintiff and diagnosed her with a "syncope episode [and an] inner ear infection." *Id.* Dr. Smith conducted x-

---

[3] Plaintiff alleges only lower back and leg pain in her Disability Report (TR 76), but alleges lower back and leg pain, degenerative disc disease, lower extremity edema, upper and lower thoracic osteophytes, obesity, hypertension, type II diabetes, and iron deficiency anemia in her Motion for Judgment on the Administrative Record (Docket Entry No. 13).

4

rays of Plaintiff's "PA & lateral chest"; "[f]lat and upright abdomen"; and "carotid doppler." TR 184-190. The results were normal, except that Dr. Smith noted that Plaintiff had "some systolic hypertension." TR 184.

Plaintiff returned to Dr. Davis on April 2, 1998, complaining of lower back pain and left leg pain. TR 136. Dr. Davis reviewed Dr. Bilbrey's MRI performed on March 24, 1998, and concluded that Plaintiff had a "large left disc herniation which was noted on a previous MRI which I had reviewed performed 10-13-95." *Id.* Dr. Davis stated: "[A]ll these intermittent episodes of pain flair ups are exacerbations of an underlying pre-existing L5-S1 HNP." TR 135. He opined, "I feel that this is related to her initial on the job injury." *Id.* Dr. Davis scheduled Plaintiff for surgery. TR 134-135.

Dr. Ray W. Hester examined Plaintiff on April 23, 1998, for complaints of severe back and left leg pain, as well as associated numbness and tingling. TR 169. Dr. Hester noted: "When she stands the pain is so bad that she can hardly stand it." *Id.* Dr. Hester ordered x-rays which revealed a "large disc protrusion at L5-S1 on the left." *Id.* On April 27, 1998, Plaintiff entered Saint Thomas Hospital ("Saint Thomas") for surgery. TR 116-121. Dr. Hester and Dr. Robert Isaacs performed a "lumbar laminotomy with removal of disk, L5-S1, left." TR 120. On April 29, 1998, while recovering at Saint Thomas, Plaintiff underwent a "CT Scan of the Lumbar Spine." TR 126. That same day, Cynthia Sullivan, a physical therapist at Saint Thomas, assessed Plaintiff and reported that she had "excellent" rehabilitation potential. TR 129. Plaintiff was discharged on May 1, 1998. TR 130.

Plaintiff visited Dr. Hester on June 2, 1998, for a post-surgery follow-up examination. TR 167. Dr. Hester noted:

> [Plaintiff] is really doing pretty well. Her incision is well healed.

> She is not having any real pain much [*sic*] although a little
> soreness still in her hip and left leg.

TR 167.  Plaintiff again visited Dr. Hester on July 7, 1998.  *Id.*  Dr. Hester noted that Plaintiff

"has a 10% partial permanent impairment to the body as a whole as a result of her injury."  *Id.*

Dr. Smith treated Plaintiff intermittently for obesity, hypertension, and iron deficiency

anemia from September 10, 1999, to December 10, 2001.[4]  TR 147-153; 191-196.  On September

10, 1999, Plaintiff reported "weakness when standing up and walking."  TR 153.  On September

27, 1999, Plaintiff reported "tightness in chest" and that "her legs feel heavy – weak."  TR 152.

On October 19, 1999, Dr. Smith reported that Plaintiff had undergone a recent

echocardiogram which showed "some sclerosis of the mitral and aortic valve."  TR 151.  Dr.

Smith also noted Plaintiff's anemia, hypertension, glucose intolerance, and fibrocystic breast

disease.  *Id.*  Dr. Smith reported that Plaintiff was to continue taking Tenoretic and Ferous

Sulfate; that he was "going to ask the cardiology group in Cookeville to consult on the patient";

that he was "going to have her to come back about every week or two for iron test"; that she

would have "another fasting blood sugar done"; and that he would examine her again in "about

four weeks."  *Id.*

Dr. Donita Keown examined Plaintiff on December 29, 1999, and noted:

> normal straight walk, performed without limping or impairment.
> There is no impairment on the tandem walk, 1-foot stand, or
> Romberg.  Reflex of +1 over both patellas and ankles.  Motor
> strength in the left and right legs graded at 5/5.  There are no
> studies pending at this time.

TR 170-171.

---

[4] The signature on the medical reports (147-150; 194-196) is not Dr. Smith's and is
illegible, however, Plaintiff is presumed to be under Dr. Smith's care.  Additionally, certain
reports contain no signature.  TR 151; 153.  Overall, the medical reports are largely illegible.

6

On January 10, 2000, Dr. Reeta Misra conducted a Residual Functional Capacity ("RFC") assessment regarding Plaintiff. TR 172-179. Dr. Misra opined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk approximately 6 hours in an 8-hour workday, and sit for approximately 6 hours in an 8-hour workday. TR 173. Dr. Misra also noted that Plaintiff was unlimited in her ability to push and/or pull. *Id.* Dr. Misra further noted:

> 44 yr old w/ allegations of back and leg pain, HBP. Claimant had a Lumbar Laminotomy in 4/98. No other TP notes rec'd after 7/98 [*sic*]. AT OV III, 30 1/4", 229 lbs BP 170/88. Thoracolumbar column anterior Flexioin w/ discomfort was 70 [degrees], extension 20 [degrees]. She has full ROM in both hips, there was no obvious scoliotic curvature, no spasms or palpations. Normal straight-leg walk, gait [and] station are normal, motor strength 5/5.

*Id.* Dr. Misra opined that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. TR 174. Dr. Misra noted no established manipulative, visual, communicative, or environmental limitations. TR 175-176.

Dr. Smith's records from January 27, 2000, indicate that Plaintiff was assessed with "Iron Def. Anemia."[4] TR 149.

On April 17, 2001, a consulting physician[5] completed another RFC assessment regarding Plaintiff. TR 158-165. The physician opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday. TR 159. The physician further opined that Plaintiff was unlimited in her ability to push and/or pull. *Id.* The

---

[4] This record has been signed by another doctor, and it is unclear whether this doctor or Dr. Smith examined Plaintiff on this date. TR 149.

[5] The name of the consulting physician is illegible. TR 165.

physician noted that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. TR 160. The physician noted no established manipulative, visual, communicative, or environmental limitations. TR 161-162.

Plaintiff visited Dr. Donita Keown on April 4, 2001, for complaints of lower back "discomfort"; "aching discomfort into the left hip"; and numbness. TR 154. Dr. Keown noted "trace" edema in both lower extremities, but also noted that "[t]here is full range of motion...[in the] hips, knees and ankles..." TR 155. On the same day, Dr. P.K. Jain performed x-rays of Plaintiff's lumbosacral spine and noted "[m]arked degenerative disc disease at L5-S1." TR 156-157.

On July 14, 2001, Plaintiff was seen by P.A. Gary Burks. TR 193. Mr. Burks checked Plaintiff's blood sugars, and "noticed it [*sic*] being up." *Id.* Mr. Burks also noted that Plaintiff had "more polyuria, polyphagia, and headaches." *Id.* Mr. Burks concluded that Plaintiff had type 2 diabetes, and recommended that Plaintiff resume a diabetic diet. *Id.*

Dr. Christopher S. Sewell of Jamestown Regional Medical Center examined Plaintiff on January 1, 2003, for abdominal pain. TR 203-204. Dr. Christopher assessed Plaintiff with "[a]cute gastroenteritis; [n]ausea; vomiting and diarrhea; [k]etonuria; [t]ype II diabetes mellitus; [h]ypertension; [o]besity; [and] [b]ack pain." TR 204. Plaintiff visited Dr. Sewell again on January 14, 2003, complaining of back pain and requesting refills of her medications. TR 245. Dr. Sewell took x-rays of Plaintiff's lumbar spine, which revealed "no acute osseous abnormality with degenerative disk disease at L5-S1 and indications of previous left sided laminectomy at the L5 level." TR 246. Plaintiff returned to Dr. Sewell on February 13, 2003, complaining of back and leg pain, and reported that she "still feels very weak in her back." TR 247. Dr. Sewell ordered her to "continue taking anti-inflammatory medicine..." *Id.*

8

Dr. Sewell completed a Medical Assessment of Ability to do Work-Related Activities evaluation of Plaintiff on May 19, 2003. TR 248-251. Dr. Sewell noted that Plaintiff's lifting or carrying was affected by her impairment because of, *inter alia*, back pain, hypertension, diabetes, obesity, and iron deficiency anemia.[6] TR 248. Dr. Sewell opined that Plaintiff could occasionally and frequently lift and/or carry less than 10 pounds, stand and/or walk for less than 2 hours total in an 8-hour workday (for less than 2 hours without interruption), and sit less than 2 hours total in an 8-hour workday (for less than 2 hours without interruption). TR 248-249. Dr. Sewell also opined that Plaintiff could occasionally climb, balance, crouch, kneel, and crawl. *Id.*

Dr. Sewell noted that Plaintiff's impairment affected her physical functions with respect to reaching and "pushing/pulling," but that Plaintiff's impairment did not affect her physical functions with respect to handling, feeling, seeing, hearing, and speaking.[7] TR 250. Dr. Sewell noted environmental restrictions caused by Plaintiff's impairment regarding heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibration.[8] *Id.* Dr. Sewell concluded that Plaintiff "is completely disabled and likely to remain so for life."[9] TR 251.

### B. Plaintiff's Testimony

Plaintiff testified that she completed 9 years of schooling and has obtained a GED. TR 255. Plaintiff testified that prior to her injury in 1998, she had been a home health aide and a

---

[6] The remaining medical findings in this report are illegible.

[7] How the physical functions were affected and the medical findings that supported Dr. Sewell's assessment regarding Plaintiff's physical functions are illegible.

[8] How the environmental functions were affected and the medical findings that supported Dr. Sewell's assessment regarding Plaintiff's environmental functions are illegible.

[9] Dr. Sewell's handwriting is partially illegible.

9

garment inspector. *Id.* Plaintiff stated that, after her surgeries, she had worked at Wal-Mart in the photo department, at a hospital as a housekeeper, and at the Russell Stover candy plant for "one day." *Id.* Plaintiff also testified that she had been temporarily employed with Adecco for "three or four months." TR 256.

Plaintiff testified that after her first surgery, she developed a "spur that was touching the nerve and it was causing it to be more severe." TR 256-257. Plaintiff stated that 2 days after her first surgery, Dr. Hester performed another surgery to remove the spur. TR 257. Plaintiff testified that she had attempted to return to work after her surgeries. She explained that:

> at the hospital I had a job in housekeeping and it required me to mop, vacuum, empty all the trash cans on all the floor[s] that I was working on and there was no way I could do that without bending and lifting. And the pain was so severe I just couldn't do that job. And then the photo department, I was on my feet in one place other than just walking in this little square and I had to clean the camera machines and it was quite heavy and I had to clean that every day. And it was - - the pain was horrible so I couldn't continue it. And at the candy place, the one day I worked I stood in one place on a mat and worked with my - - taking boxes off the line, putting them back on. And I nearly - - I just didn't think I could get home but I did get home and I was in bed for a wee [*sic*].

TR 257-258.

Plaintiff testified that she had worked for Adecco making ink pens, where she sat part of the time and stood part of the time. TR 258. Plaintiff stated that her "pain was just so severe again and I just couldn't perform it." *Id.* Plaintiff testified that she had last worked on September 18, 2001. *Id.*

Plaintiff testified that she had developed diabetes. TR 258-259. Plaintiff stated that she had started taking Glucophage on July 14, 2001, and that she had previously controlled the problem with her diet. TR 259. She reported that she felt a "dizzy feeling" at least twice a

10

week.  TR 259-260.

Plaintiff stated that she had changed her medication to "Glyburide," and that she also took allergy pills daily for symptoms that were "like a cold...but it's not a cold."  TR 260. Plaintiff additionally stated that she was anemic, that her iron was low, and that she took 2 pills daily for the condition.  TR 260-261.

Regarding her back problem, Plaintiff testified: "I have to lay down at least 20 minutes, two to three times a week.  And then if I -- if it flares up and hurts severely then I have to lay down for an hour to two hours and - - to get it to calm down."  TR 261.  Plaintiff stated that she had at "least ten or more" days in the month where she would have to lie down for an hour to 2 hours.  *Id.*  Plaintiff testified that she was on a diet for her diabetes and back, and that she had lost 15 pounds.  *Id.*

Upon examination by the ALJ, Plaintiff testified that she drove to the grocery store and to church.  TR 262.  Plaintiff testified that she had had to "lift people" and "drive from place to place" as a home health aide, and that she had had to lift "50 pound bundles" as a garment inspector.  TR 263.  Plaintiff stated that, while making pens at Adecco, she would sit for "a while," rotate with another employee, and then stand for "a while."  TR 263-264.  Plaintiff testified that she had worked for Adecco for approximately "[t]hree or four months."  *Id.* Plaintiff reported that her work at Adecco had required her to lift 20 pound boxes.  TR 265. Plaintiff answered affirmatively when asked if her hospital cleaner job "was like her past work." *Id.*

Plaintiff testified that she took 3 pills a day.  TR 266.  She then explained that she took "Atenol" for high blood pressure, 2 pills for her iron, "Altace" for her diabetes, and a calcium

Case 2:04-cv-00016   Document 17   Filed 05/12/06   Page 11 of 23 PageID #: 11

pill.[10]  *Id.*  Plaintiff testified that the medications caused "weakness."  *Id.*  Plaintiff further stated

that she took Advil and Tylenol for her back pain, and that she used a "heat pad" for her back.

TR 267.  Plaintiff testified that she had never received injections, a "TENS Unit," or physical

therapy.  *Id.*

When asked how far she could walk, Plaintiff answered that she was "not good with

distance," and that she could "[p]robably [walk] a block, two blocks maybe."  TR 268.  Plaintiff

then testified that she could "hardly stand," and that she would "start hurting just standing."  *Id.*

Plaintiff stated that she could only sit for "30 minutes or something like that."  *Id.*  Plaintiff

reported that she was able to "lift milk," however, she did not take out the trash.  *Id.*  When

asked about groceries, Plaintiff replied that she would carry them into her house "one bag at a

time" and added that she would "shop where they'll bag it lightly."  *Id.*  Plaintiff testified that

she prepared meals for herself and her husband, washed the dishes, swept the floor "a little," and

did the laundry.  TR 269.  Plaintiff testified that she no longer worked in the yard.  *Id.*  Plaintiff

reported that, to occupy her mind, she would read and watch television in the evening.  TR 269-

270.

When asked about her sleep, Plaintiff testified that she would not have problems sleeping

"with the medicines [she's] on."  TR 270.  Plaintiff reported that she needed to "sit in a chair to

dress [her] bottom half."  *Id.*  She added, "I can't stand and dress myself."  *Id.*  Plaintiff testified

that rainy weather would make her entire back sore, and that "it gets worse every year."  *Id.*

Plaintiff reported that she did not smoke or drink alcohol, however, she drank 3 cups of

---

[10] Although Plaintiff testified that she took 3 pills a day, it is apparent from her
subsequent explanation that she took at least 5 prescribed pills a day, in addition to a calcium
pill, and an indeterminate amount of Advil and Tylenol.

caffeinated coffee per day.  TR 271.

Upon re-examination by her attorney, Plaintiff testified that Dr. Sewell had wanted to conduct an MRI of her back because she experienced pain.  TR 271-272.  When asked about her condition, Plaintiff testified: "My left leg has stayed somewhat numb ever since I had surgery and it hurts. ... [b]ut this on my right [leg] was new.  I hadn't had it before and it was running down part of my leg on the right side and he wanted to do an MRI."  TR 272.  Plaintiff testified that she had been unable to obtain an MRI because "the insurance didn't want to pay for it," so she "did [her] own doctoring."  *Id.*  She reported that, "[she] just laid around and...put heat on it and...just rested and took my Advil..."  *Id.*

Upon re-examination by her attorney, Plaintiff testified that her need to lie down for 20 to 30 minutes did not occur at a specified time of the day.  TR 278.  Plaintiff reported: "I just lay down when I feel - - when I can't take it no more I just lay down and use my heat pad."  *Id.*

### C.  Vocational Testimony

Vocational Expert ("VE"), Rebecca Williams, also testified at Plaintiff's hearing.  TR 273-278.  With regard to Plaintiff's past relevant work history, the VE classified Plaintiff's CNA and home health aide positions as "medium" and "semi-skilled"; her cleaner job as "medium" and "unskilled"; her garment inspector position as "light and semi-skilled"; her pen assembler position at Adecco as "light" and "unskilled"; and her film developer job with Wal-Mart as "light" and "unskilled."  TR 273-274.

The ALJ presented the VE with a hypothetical situation in which the claimant was limited to light work, walking or standing for no more than 6 hours out of an 8-hour workday, sitting for 6 hours out of an 8-hour workday, and required a "sit/stand option."  TR 275.  The ALJ then asked the VE whether the hypothetical claimant could "do any of [Plaintiff's] past

13

relevant work?"  *Id.*  The VE testified that with a "sit/stand option," the hypothetical claimant "should be able to do the work that she had at Adecco."  *Id.*  The ALJ then asked the VE whether the hypothetical claimant could do any of Plaintiff's past relevant work if the hypothetical were modified to require a "sit/stand at-will" option.  *Id.*  The VE testified that, assuming the hypothetical claimant could sit/stand at-will, "[s]he could not do any of [Plaintiff's] past work."  TR 276.

The ALJ then asked the VE to identify any jobs "at the light and sedentary level that such a person could perform."  *Id.*  The VE testified that such jobs would include machine operator, assembler, inspector, cashier, receptionist, and information clerk.  *Id.*  The VE opined that, at the light level with a sit/stand at-will option, there were approximately 4,000 machine operator positions and 1,200 assembler positions in the State of Tennessee that a person in the ALJ's proffered hypothetical would be able to perform.  *Id.*  The VE additionally opined that there were 900 inspector jobs at the light level in the State of Tennessee that would be appropriate for the hypothetical claimant.  *Id.*  At the sedentary level, the VE opined that, in the State of Tennessee, there were approximately 8,000 cashier positions, 1,100 receptionist positions, and 1,300 information clerk positions, that a person in the ALJ's proffered hypothetical would be able to perform.  *Id.*

The ALJ then asked the VE to reconsider the second hypothetical and to "assume not [*sic*] stand or walk for no more than two hours out of an eight-hour day and lifting no more than ten pounds frequently or occasionally."  TR 276.  The VE answered: "Those jobs that are classified at the sedentary level would still be available."  *Id.*

The ALJ asked, "Now, the limitation that I provided with regard to concentration, persistence and pace, let us say that's a severe limitation.  What would the affect be?"  TR 277.

14

The VE answered: "There would be no jobs, sir." *Id.* Referring to Dr. Sewell's RFC, the VE testified that there would be no work for someone with such an evaluation. *Id.* The VE then added, "I think that her testimony would allow for sedentary jobs with a sit/stand at-will option." *Id.*

Upon examination of the VE by Plaintiff's attorney, the VE testified that Plaintiff's alleged need to lie down for 1 to 2 hours at least 10 days per month "would have an affect on attendance and ability to attend to work tasks." *Id.* The VE then stated that Plaintiff's alleged need to lie down for 20 to 30 minutes the remaining 20 days per month "would make a difference but she didn't specify as to whether or not that would be something she would have to do in the afternoon time or if it would be during a particular work period." TR 278.

### III.  CONCLUSIONS OF LAW

#### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

15

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

16

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[11] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.

---

[11] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in not according great weight to Dr. Sewell's opinion, but assigning great weight to Dr. Keown's opinion, and in not considering the effects of Plaintiff's obesity. Docket Entry No. 13. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed or remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery*

*v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Weight Accorded to Opinion of Plaintiff's Treating Physician

Plaintiff maintains that the ALJ erred in not according great weight to Dr. Sewell's opinion, but assigning great weight to Dr. Keown's opinion. Docket Entry No. 13.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
>
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...
>
> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

19

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
...

20 C.F.R. § 416.927(d) (emphasis added). *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

Dr. Sewell treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to his opinion than to other opinions. TR 197-218; 245; 247-251. As the ALJ noted in his decision, however, Dr. Sewell's RFC opinion contradicts other substantial evidence in the record. In particular, Dr. Sewell's RFC opinion that Plaintiff "is completely disabled and likely to remain so for life," contradicts the opinions of Drs. Keown and Hester. TR 13; 15. It is also internally inconsistent, as it is inconsistent with his own treatment notes and an x-ray[12] performed that same year (at his request) which indicated that Plaintiff had "no acute osseous abnormality with degenerative disk disease" (TR 246; 251).

As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Because Dr. Sewell's

---

[12] The ALJ's decision mistakenly refers to this x-ray as an MRI. TR 17.

RFC is inconsistent with other evidence of record, the Regulations do not mandate that the ALJ accord Dr. Sewell's evaluation controlling weight.

Plaintiff also contends that the ALJ erroneously granted great weight to the findings of Dr. Keown, a consultative examiner. Docket Entry No. 13. The ALJ found that Dr. Keown's findings were supported by, and consistent with, the record, and therefore accorded them great weight. TR 17; 20 CFR § 404.1527(d)(3)-(4). Specifically, the ALJ determined that Dr. Keown's findings were consistent with the findings of Dr. Hester, and also with Plaintiff's report of her daily activities, rather than with Dr. Sewell's conclusion that Plaintiff was totally disabled. TR 14-17.

Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled because the definition of disability requires consideration of both medical and vocational factors. *See, e.g., King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988). The VE testified that Plaintiff would be capable of making a vocational adjustment to numerous jobs that exist both in the State of Tennessee and nationwide. TR 275-277. Accordingly, Plaintiff's argument fails.

## 2. Obesity

Plaintiff contends that the ALJ further erred by not considering the effects of Plaintiff's obesity. Docket Entry No. 13.

The Code of Federal Regulations requires that:

> "when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity."

21

20 C.F.R., Pt. 404, Subpt. P, App. 1, 1.00(Q)

The ALJ's decision that Plaintiff maintained the residual functional capacity to perform light work in spite of her obesity was supported by substantial evidence. As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion," *Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell*, 105 F.3d at 245 (*citing Consolidated Edison Co.*, 305 U.S. at 229).

The record here is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence." Additionally, the ALJ's decision demonstrates that he carefully considered the testimony of both Plaintiff and the VE. While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's determination that Plaintiff has the residual functional capacity to perform light work activity, and, thus, is not disabled. TR 16,19-20. In coming to this conclusion, the ALJ discussed the opinion of Dr. Keown, who, in performing a full functional examination of Plaintiff, noted her obesity and the combined effect of her impairments on her residual functional capacity, range of motion, motor strength, and ability to ambulate. TR 155-156. The ALJ specifically discussed these findings in his opinion, and he noted the impact of Plaintiff's obesity on her ability to perform work-related activities. TR 14; 16.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the

22

conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision that Plaintiff retained the capacity to perform light work in spite of her obesity (and its effect on her other impairments) was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

23